## GEORGE P. P. BONNELL
*vs.*
## BERT G. THOMPSON ET AL.

Superior Court        Middlesex County        File No. 8165

MEMORANDUM FILED JULY 14, 1942.

*F. Howard Stickney,* of Deep River, for the Plaintiff.

*Carlos B. Ellis,* of Middletown, for the Defendants.

Memorandum of decision in action to recover damage to property attached.

INGLIS, J. In April, 1940, Bert G. Thompson was the sheriff for Middlesex County, the defendant, Edward C. Binge, was one of his deputies and the defendant, The Hartford Accident and Indemnity Company, was the surety on the sheriff's bond.

On April 10, 1940, said Binge, as deputy sheriff, had in his hands for service, a writ and complaint signed by Russell Back as Commissioner of the Superior Court in an action brought by Savings Investment and Trust Company against the plaintiff here, George P. P. Bonnell, then a resident of Essex, Connecticut. Pursuant to the direction of that writ he undertook to attach a yacht owned by Bonnell known as "Old Glory." At the time, the yacht was on the marine railway in the storage shed of the Essex Marine Railway and Sales Corporation in Essex where it had been in storage during

the winter of 1939-1940. The yacht was nearly 60 feet in length and, because of its size, it had not been practicable to remove it from the railway to either side of the shed. It therefore blocked the way for the launching of the other boats which were stored there and the agreement between Bonnell and The Essex Marine Railway and Sales Corporation had been that this boat should be the last boat hauled in the fall of 1939 and the first boat put into the water in the spring of 1940. As a matter of fact it had been put into the water temporarily a few days before April 10th and then had again been drawn out for painting. It was in the process of being painted when the deputy sheriff arrived to attach it.

All that Binge did in making the attachment was to notify. Ross Perkins, the president of the Essex Marine Railway and Sales Corporation that he was attaching the boat and to paste a sticker certifying that the yacht was attached across the doors on one side of the deck house. All the other entrances to the inside of the yacht were locked on the inside.

At the time Binge told Perkins that he might finish painting the yacht but told him emphatically that he must not put her back into the water. At this last, Perkins protested but Binge told him it probably would be only a few days before the case would be settled and the attachment released and insisted that the boat be kept out of the water. He did not, however, appoint Perkins, or anyone else, as keeper of the boat. He did leave a copy of the writ and complaint with Perkins because the Essex Marine Railway and Sales Corporation was named therein as a garnishee.

At the time of the attachment Bonnell owed the Essex Marine Railway and Sales Corporation about $220 for storage and labor on the yacht but the company did not intend to enforce its lien on the boat for those charges.

On a later day, the date of which did not appear in evidence, Perkins called Binge on the telephone and asked permission to put the yacht in the water but Binge still insisted that the boat must not be launched and assured Perkins that he would do all he could to get the case settled so that the attachment could be released.

As a matter of fact, Perkins had put the boat in the water very shortly after April 10th and was keeping her in the company's slip.

After prolonged negotiations the case was finally settled by Bonnell's payment to Back of $1,400 on June 27th. Back delivered a release of the attachment to Perkins at the latter's yachtyard on July 5th and then for the first time knew that the boat was in the water. Binge did not know that the boat was in the water until July 13th when Back called him on the telephone and told him that Bonnell was claiming that the boat had been damaged and wanted Binge to come down and see it.

After Perkins had launched the boat he had allowed her to stay in his company's slip unattended until June 3rd. By that time the deputy sheriff's sticker had been washed off by the rain and Perkins went aboard and pumped her out. He pumped her out again on June 13th. After that she received no attention until after the attachment had been released.

After the yacht was launched a considerable amount of water leaked through her hull and because her scuppers became clogged still more water backed up in her well decks and flowed under the doors of the deckhouse down into her cabins. This water did substantial damage to the varnish in the cabins and some damage to the reduction gears. It also caused the outside of the engine to rust.

It is obvious that the secondary but principal cause of the damage to the yacht was the putting of it into the water. The immediate cause was the failure to take proper care of it after it was launched. If the boat had been allowed to stay in the shed of the Essex Marine Railway and Sales Corporation the damage would not have been done or if proper care had been given to it after it was launched the damage probably would not have occurred. The question to be decided therefore is as to whether the defendants are responsible for either the launching of the yacht or the failure to take proper care of it after it was launched.

The theory of an attachment is that so long as the attached property is under attachment it is in the custody of the attaching officer as the representative of the law. *Coit vs. Sistare*, 85 Conn. 573, 577. While attached property is in his custody, it is the duty of the officer simply to exercise reasonable care to keep it safe from loss or damage. 4 *Am. Jur. Attachment and Garnishment* §544.

In this case, The Essex Marine Railway and Sales Corpora-

tion was the bailee of the plaintiff and as between the plaintiff and Binge, that company's possession and custody of the boat were the possession and custody of the plaintiff. Any acts or omissions of the company within the terms of the bailment were likewise the acts or omissions of the plaintiff.

It is of course fundamental that in order to make a valid attachment of personal property the officer must do all that is reasonably practicable to take and hold the property in his physical possession. *Gray vs. Bracken,* 107 Conn. 300; 4 *Am. Jur. Attachment and Garnishment* §537. It is true that where the property is bulky and it would be wasteful or impracticable to move it, the attachment will be good without removal, if the officer indicates that he attaches it and uses due vigilance to prevent its going out of his control. Under such circumstances it has been held that he retains possession of it as against third parties "if there was no interference of the debtor" and if he uses due vigilance to prevent the property from going out of his control. *Mills vs. Camp,* 14 Conn. 219. Where, however, the owner of the property does not acquiesce or where the officer does not use due vigilance the attachment does not hold either as against third parties or the owner. This is held in *Knox vs. Binkoski,* 99 Conn. 582, a case practically on all fours with the present case. In that case, the officer had undertaken to attach a cage of lions by simply announcing to the bailee of the lions that he was attaching them and putting a sticker on the door of the cage. The action in which the attachment was made was one against the bailee. It appeared that the bailee had sold the lions to another person but that person had allowed the bailee to keep the possession and the attachment was made on the theory that the true owner was estopped to deny the bailee's ownership. Shortly after the purported attachment had been made the true owner took the lions into her possession. Later the officer reattached the lions and took them out of the possession of the owner and for that act she sued him for wrongful conversion. It was held that she could recover because at the time of the second attachment the property was not in the possession of the bailee and the first attachment was not valid to hold the property against the owner. When she asserted her right and took possession of the lions the officer lost custody and the attachment failed. Accordingly, in the present case, it would seem clear that what the defendant Binge did in making the attachment was not sufficient to hold the boat under attachment unless the owner acquiesced. In

launching the boat the marine railway company was acting pursuant to its contract with Bonnell and therefore was acting in his shoes. The launching of the boat contrary to the deputy sheriff's orders was an assertion by Bonnell that he did not acquiesce in the attachment. It was an act which took the possession of the boat away from the sheriff, assuming that he had had possession up to that time. It took the boat out of his custody. The attachment was thereby terminated and the responsibility of Binge to care for the boat was ended.

For that reason, in as much as the damage suffered by the yacht all occurred after that time and flowed from the act of the bailee of the owner in launching the craft, it is concluded that the defendants cannot be held responsible for that damage.

Even though it should be held that the attachment still continued in effect after the launching of the boat and that the boat still continued in the custody of the officer, still the facts would not justify a conclusion that Binge failed to use reasonable care to protect the yacht. The plaintiff claims, among other things, that Binge was negligent in that he failed to appoint a keeper of the attached property. The answer to that is that he owed no duty to the plaintiff to appoint such a keeper. The only purpose of appointing a keeper under such circumstances is to perfect the officer's possession and guarantee the validity of the attachment. There is no requirement of law that such a keeper be appointed and the failure to appoint one is no violation of the rights of the owner of the attached property. Along this line it makes no difference that in the officer's return he stated that he had appointed a keeper. That statement was the result of a misunderstanding between him and Ross Perkins. Ross Perkins was president of the marine railway company and therefore the plaintiff knew that no keeper had been appointed and they were not misled by the statement in the officer's return.

As bearing on the other claim of negligence it is enough to point out that Binge had no actual knowledge that the yacht had been put into the water until long after the damage was done. As a reasonable man he had the right to assume and believe that the yacht was not in the water but was being safely kept in the shed of the Essex Marine Railway and Sales Corporation. On at least two occasions he had instructed Perkins not to launch the boat and Perkins had given no indication that he intended to or had disobeyed those instructions.

Under such circumstances reasonable care did not require Binge to make periodic inspections of the yacht or do anything else that he did not do. The damage to the yacht, resulting as it did from the act of the plaintiff's bailee in launching the boat and such launching having been without the knowledge of Binge and not to have been anticipated by him, cannot be held to have been caused by any negligence on his part.

Judgment may enter for the defendants to recover of the plaintiff their taxable costs.